IN THE

# SUPREME COURT OF JUDICATURE

OF THE

# STATE OF INDIANA,

AT INDIANAPOLIS, MAY TERM, 1829, IN THE THIRTEENTH YEAR OF THE STATE.

---

## ELLIOTT v. ARMSTRONG.

A *trust estate* in real property, as separate from the *legal ownership*, may either be created by an express declaration of the trust; or it may be raised upon certain facts by implication of law.

The statute of frauds requires all declarations of trust in land *to be proved* by written testimony; but those trusts which arise by the mere operation of law, are excepted out of the statute and may be proved by parol evidence.

If *A.* purchase land *with his own money*, and the deed be made to *B.*, a trust results in favour of *A.*, provided there be no circumstances in the case to rebut this presumption of the law.

To a bill in chancery by the grantee of a *cestui que trust* against the trustee to obtain the legal title, the grantor need not be a party either as complainant or defendant.

*A.* contracted to sell to *B.* certain real estate, in consideration that *B.* should give up a note held by him against *A.*, and pay to *A.* a small sum of money. The giving up of the note to *A.* was the principal part of the consideration. *B.* subsequently pledged the note to a third person, and absented himself from the country for 7 years, without paying any part of the purchase-money. *Held,* that *A.* was discharged from the contract.

The estate of a *cestui que trust* may be sold and conveyed by him, as well as any other estate.

A release, by the grantee, of the covenant of warranty contained in a conveyance of real estate, does not affect the validity of the conveyance.

The estate of a bare trustee is not subject to be sold on an execution against him.

The sale of real estate on a void execution is a nullity, and vests no title in the purchaser.

May Term,
1829.

ELLIOTT
v.
ARMSTRONG.

A complainant in chancery may prove, by parol evidence, in order to show a resulting trust, that the purchase-money for real estate conveyed to another was paid by himself, though the deed state that the money was paid by the grantee, and the answer contain a denial of the trust.

The absolute right of property and the right of possession in a note, which had been pledged for the payment of a debt, become, on payment of the debt, vested in the pledgor; and if the note be afterwards converted by the pledgee to his own use, he is liable to the pledgor in an action of trover.

In the sale of personal property, not in market overt, the general rule is, that, though the purchase be *bona fide* and for value, the purchaser receives no better title than that of which the seller was possessed. But bills of exchange and promissory notes are exceptions to this rule: when they are originally payable to bearer; or when, in the first instance, they are payable to order and afterwards by a blank endorsement become payable to bearer; they pass by delivery; and the purchaser who uses due caution, pays a valuable consideration, and takes them in the common course of business, has a good title against all the world, whether the seller had any title or not. A note payable to order, however, cannot pass without an endorsement either by the payee, or by some person in the payee's name and by his authority.

The trust, in real estate conveyed to *A.*, resulting in favour of *B.* in consequence of his payment of the purchase-money, is a kind of arbitrary implication raised, to stand until some reasonable proof be brought to the contrary; and if the money was paid for the express purpose of vesting in *A.* both the beneficial and legal interest, no trust can result in favour of *B.*

*A.* made a verbal contract for the purchase of a town lot, and, during *A.'s* absence from the country, *B.*, partly with his own money but principally with *A.'s* property, completed the contract for *A.*, and took the deed in the name and for the benefit of *A.* *Held*, that *A.'s* subsequent ratification of *B.'s* acts, made him liable to *B.* for the amount paid for him by *B.*; and also rendered the lot as *A.'s* property liable, from the date of the deed, to a judgment against him in favour of *B.*

APPEAL from the *Dearborn* Circuit Court.

Tuesday,
May 5.

BLACKFORD, J.—This is a suit in chancery from the *Dearborn* Circuit Court. *Armstrong* was the complainant below, and *Elliott* the defendant. It is the case of a *cestui que trust*, demanding a conveyance of real estate from his trustee.

The bill states, that *Vance* and *Dill*, being indebted to *Elliott* in the sum of 67 dollars and 56 cents for cooper's work, gave him their due-bill, dated the 15th of *March*, 1805; and thereby acknowledged themselves indebted in that amount to *Elliott* or order;—that shortly afterwards, *Vance*, for the purpose of paying the said note, proposed to let *Elliott* have a town lot, numbered 171, in *Lawrenceburgh*, for 75 dollars; *Elliott* paying the difference between the amount of the note and the price of the lot; to which proposition *Elliott* seemed willing; and he was to receive a bond for a deed, as soon as he gave up the note and paid the said balance;—that in 1807 *Elliott* left

the Western country, having first transferred the note of *Vance* and *Dill*, by delivery, to *Ruffin* of *Cincinnati*, as collateral security for a debt which *Ruffin*, as *Elliott's* surety, was bound for to *Vattier*, and had afterwards to pay; and that *Ruffin*, having been told by *Elliott* that *Vance* and *Dill* would pay the note on sight, called upon *Vance* to his astonishment for payment;—that when *Elliott* transferred the note, he made no arrangement, nor has he made any since, for paying the consideration-money for the lot; nor did he signify then, nor has he signified since, any intention or wish to have the lot, in the manner proposed by *Vance*, or otherwise.

The bill further states, that in 1810, *Horner*, having claims against *Elliott*, sued out an attachment against him, which was levied on the said lot, numbered 171, under the impression that it was *Elliott's*; and that, in 1811, judgment was obtained on the attachment for upwards of 100 dollars; which judgment is assigned to the complainant;—that on *Horner's* discovering that *Vance* had still the legal and equitable title to the lot, *Vance* agreed to let *Horner* have it at the same price that *Elliott* was to pay; that is, upon his getting up for *Vance* the said note, which was then *Ruffin's*, and paying *Vance* the balance of the consideration-money; and that with these terms *Horner* complied;—that some doubts existed with *Vance* as to whom the deed ought to be made; whether directly to *Horner*, he having paid the whole consideration-money; or to *Elliott*, so that *Horner* might sell the lot by virtue of his judgment on the attachment; that *Vance*, however, being advised so to do, made the deed to *Elliott*, but delivered it to *Horner* for his sole benefit; *Horner* having paid the whole of the purchase-money;—that *Horner* then took out execution on his judgment against *Elliott*, levied it upon the said lot, bought the same for 75 dollars at the sheriff's sale, and received the sheriff's deed; the said amount passing as a credit to *Elliott* upon the judgment;—that in 1812, *Horner*, by virtue of the premises, took possession of the said lot, and continued to occupy it and pay the taxes until 1816; when the complainant, believing the lot to be *Horner's* in fee simple, purchased the same for 300 dollars, received a deed from him, took peaceable possession, and proceeded to make valuable improvements.

The bill further states, that *Elliott* returned to the country in

1819; and, being informed of the deed, and of the sale of the lot on execution, he said that the deed to him had been made without authority, and refused to take it out of the recorder's office; but hearing soon after, that the sheriff's sale was probably erroneous, if not void, he took the deed, and in an action of ejectment for the lot, commenced in 1819, recovered judgment against the complainant in 1821, on the ground that the sheriff's sale to *Horner* was void; which judgment was affirmed by this Court in 1822; that until after the said judgment in ejectment, the complainant was ignorant of all the facts in relation to this his equitable defence, growing out of the trust and payment of the consideration-money; and that *Elliott* threatens that he will take possession of the lot, and the improvements.

The prayer of the bill is, that the defendant be compelled to convey the said lot to the complainant, and be enjoined from proceeding at law, &c.

To this bill the defendant answers as follows:—

That *Vance* and *Dill*, being indebted to the defendant for cooper's work, gave him their note about the time expressed in the bill, for about 70 dollars; that soon after, he contracted with *Vance* to take the lot, numbered 171, in satisfaction of the note, but took no bond or deed from *Vance* for the lot, as the title was yet in the government; that he does not recollect that the price of the lot exceeded the amount of the note, but that if it did, he paid the difference in cooper's work; that immediately after the purchase, the defendant took possession of the said lot, occupied one of the two log buildings on it as a cooper's shop, and carried on the business of a cooper on the lot from the time of the purchase in 1805, until *February* or *March*, 1806, when he went to the Eastern states; leaving a journeyman of his at work on the lot, and *Percival* his general agent.

The answer also states, that when the defendant, in 1806, was about leaving the country, thinking some accident might happen to him before his return, and *Ruffin* being his surety to *Vattier* for about 66 dollars, not due for several months, he left the said note with *Ruffin* as a collateral security, in case he should have to pay *Vattier;* the defendant supposing the lot might be had of *Vance* upon production of the note; but he denies that he ever sold the note to *Ruffin*, or told him that *Vance*

would pay it upon sight; that after *Ruffin* had paid *Vattier*, and long before he had given up the note of *Vance* and *Dill*, *Percival*, the defendant's agent, placed in *Ruffin's* hands a note, belonging to the defendant, against *Brown* for about 80 dollars, to be collected; with instructions to *Ruffin* to pay himself out of the proceeds; and that judgment was obtained on this note against *Brown*, and the money, to wit, 87 dollars and 50 cents, paid to *Ruffin*, leaving a balance of about 20 dollars due to the defendant.

The defendant admits, that there was something due from him to *Horner* at the time of the attachment, and that judgment was thereon obtained as stated in the bill. He states that he has been informed and believes that *Horner*, so far from contracting with *Vance* for the said lot, procured a deed to be made for it to the defendant, not through mistake, but for the express purpose of selling it upon his said execution, as a mere equity could not be sold. He denies that he was ever the trustee of *Horner*, so far as he can understand his rights. He admits that the said lot was sold on execution, upon the said judgment, at the time stated in the bill; and that *Horner*, the judgment-creditor, became the purchaser and received the sheriff's deed.

The defendant admits that, on his return in 1819, he accepted the deed which had been made to him by *Vance*, and took it from the recorder. He admits having said, that *Horner* had no right to have a deed executed, until the defendant chose to take it from *Vance*. He also admits that, immediately on his return, he took the necessary steps to regain possession of the lot, brought an ejectment in the same year, and afterwards obtained a judgment against the complainant as stated in his bill. He denies all fraud, &c.

In addition to the answer, the defendant pleaded in bar, a release made by the complainant to *Horner*, of the covenant of warranty, contained in *Horner's* conveyance of the premises to the complainant.

There is a general replication to the answer. To the plea no reply was required.

The material facts, presented by the exhibits and proofs contained in the record of this cause, are believed to be the following:—

May Term, 1829.

ELLIOTT
v.
ARMSTRONG.

*Vance* and *Dill*, inhabitants of *Lawrenceburgh*, being indebted to *Elliott*, the defendant, who resided in the same place, for cooper's work, gave him their note, dated the 15th of *March*, 1805, for 67 dollars and 56 cents, that being the amount they owed him. This note reads as follows:—"Due *Samuel Elliott* or order 67 dollars and 56 cents, for value received. *March* 15th, 1805."

At some time during the same year, 1805, a conversation took place in *Lawrenceburgh* between *Vance* and *Elliott*, respecting the sale by the former to the latter of a lot in that town, numbered 171; the same which is now the subject of dispute. In that conversation, *Vance* proposed to sell the lot to *Elliott*, and *Elliott* agreed to take it of him, at the price of 75 dollars. This was only a verbal contract, and was not to be considered complete, until *Elliott* should give up the note of *Vance* and *Dill* of 67 dollars and 56 cents, and pay to *Vance* the difference between the amount of the note and the price of the lot. Immediately after this contract, and in consequence of it, *Elliott* took possession of the lot, and occupied a cabin on it as a cooper's shop, until some time in the year 1806, when he left *Lawrenceburgh* and went to *New-Hampshire;* leaving some property on the lot, and a journeyman at work in the shop.

Previously to his going away, *Elliott* had become indebted to *Vattier*, of *Cincinnati*, in about 66 dollars, and had given to him a note for the amount payable at a future period, with *Ruffin*, of *Cincinnati*, as his surety. When *Ruffin* heard that *Elliott* was about to leave the country, he requested from him security against his liability to *Vattier*. *Elliott*, accordingly, placed in *Ruffin's* hands the note of *Vance* and *Dill*, as a collateral security and indemnity against the claim of *Vattier;* but he did not endorse it. This note *Ruffin* was to collect from *Vance* and *Dill*, in case he should be obliged to pay the debt due to *Vattier*, which would be due in a few months.

*Elliott*, when he went away, left some business unsettled. He owed some money, and there were some debts due to him. He appointed *Percival*, of *Lawrenceburgh*, his general agent; and left with him, among other claims, a note against *Brown*, of *Hamilton* county, *Ohio*, for 87 dollars and 50 cents, payable in hogshead staves to be delivered at *Lawrenceburgh*, one-half in *June*, and the other half in *September*, 1806. In the opinion

of his agent, *Elliott* left sufficient property to pay his debts, if his business had been properly managed. The principal demand against him, beside that of *Vattier*, was one in favour of *Horner*, of *Lawrenceburgh*, for about 100 dollars.

Some time after *Elliott's* departure, *Ruffin*, as his surety, having been obliged to pay *Vattier*, called upon *Vance* for payment of the note of *Vance* and *Dill*, which *Elliott* had left with *Ruffin* as a collateral security against the claim of *Vattier*. *Vance* was much surprised at this circumstance; and informed *Ruffin*, that he had made a verbal agreement with *Elliott* for the sale of a lot in *Lawrenceburgh*, and that he expected to pay the note in that way. *Ruffin*, hearing this, expressed his dissatisfaction with *Elliott's* conduct, and replied that he would let the matter rest for the present. After this, to wit, in 1807, *Ruffin* inquired of *Percival* as to what had become of *Elliott*, told him that he had paid the *Vattier* debt, and expressed some uneasiness about it. He also told *Percival*, that he had presented to *Vance* the note which *Elliott* had placed in his hands, but that *Vance* said he would plead the contract for the lot in bar of any suit upon the note. *Ruffin*, at the same time, inquired of *Percival*, if *Elliott* had not left any property which he could attach for the amount he had paid to *Vattier*. *Percival*, in reply, informed him of his having the note against *Brown* in favour of *Elliott;* which note he gave to *Ruffin*, and told him that he could make his money out of that. *Percival* took a receipt from *Ruffin* for this note against *Brown*, and shortly afterwards wrote to *Elliott*, informing him of the circumstance.

In the *December* following, judgment was obtained at *Cincinnati* for 90 dollars and 12 cents, besides costs, in the name of *Elliott* against *Brown*, on the note thus delivered to *Ruffin* by *Percival*, the agent of *Elliott*. *St. Clair* was the attorney on record. This judgment, with the interest and costs, was collected on various executions issued during the years 1808, 1809, 1810, and 1811. The deputy sheriff states that, in 1810, the sheriff left with him sundry receipts on these executions; one by *Thomas*, which he thinks was signed by him as attorney, for 50 dollars and 50 cents; and two others by *Ruffin*, one for 5 dollars, the other for 20 dollars, signed by him, the witness believes, as agent for the plaintiff. The sheriff instructed his deputy, in 1810, to pay any money he should collect on the exe-

cution in this case, then in his hands, to *Ruffin;* and it appears that the deputy applied to *Ruffin* for instructions relative to one of the executions, and was advised by him what to do. No instructions were ever given to the deputy, in this case, except by the sheriff and *Ruffin.* The two following receipts were given by *Ruffin* for money received by him on this debt against *Brown:* "*Samuel Elliott* v. *Samuel Brown.* Execution to *December* term, 1810. *Cincinnati, October* 12th, 1810, Received of *Aaron Goforth,* late sheriff of *Hamilton* county, the sum of 82 dollars in part of the above execution; 7 dollars of which were received of defendant, as per receipt given defendant. Signed, *Wm. Ruffin.*" "Received, *Cincinnati,* 10th *December,* 1812, of *Mr. Samuel Brown,* the sum of 9 dollars, on account of the claim of *Samuel Elliott* against said *Brown.* Signed, *William Ruffin.*"

In 1810, *Elliott* not having returned, *Horner* determined to collect by law, if possible, the money due to him from *Elliott.* Supposing the lot, numbered 171, in *Lawrenceburgh,* for which *Elliott* had formerly contracted with *Vance,* did really belong to *Elliott,* he sued out an attachment against him; and the same was accordingly levied upon that lot as *Elliott's* property. In *June,* 1811, judgment was obtained against *Elliott,* on this attachment, in favour of *Horner,* for about 100 dollars. The lot however, which had been attached as *Elliott's,* was not sold; *Horner* having discovered, on inquiry of *Vance,* that *Elliott* had no title to it in law or equity; that his contract with *Vance* for the lot, was a mere verbal one; that *Elliott* had not complied with the terms on his part; and that *Vance* did not consider him as having any right to the property whatever. *Horner* then consulted with his attorneys at law, as to the best means of securing his debt. The result of this consultation was, that as the lot had increased in value since *Elliott's* agreement for it, and would probably continue to do so, *Horner* should *perfect Elliott's title* to it, if *Vance* was willing, by complying with the terms which *Elliott* had agreed to perform; and after the title should be vested in *Elliott,* that *Horner* should levy his execution on the lot as *Elliott's* property, and become himself the purchaser at the sheriff's sale. Accordingly, *Horner,* with one of his attorneys, went to *Vance* and inquired of him, whether he would be willing to make the title for the lot to *Elliott,* if

*Horner* should pay up and fulfil *Elliott's contract.* To this *Vance* agreed. *Horner* then obtained from *Ruffin,* at *Cincinnati,* for 50 dollars, the note against *Vance* and *Dill,* by *delivery* merely, without endorsement. This note *Horner* gave up to *Vance,* and paid him the difference between the amount of the note and the original price of the lot; and *Vance,* immediately, to wit, on the 10th of *March,* 1812, executed the deed for the lot to *Elliott* at *Horner's* request. As soon as this was done, *Horner* had the lot executed and sold as *Elliott's property,* purchased it himself at the sheriff's sale for 75 dollars, which sum was credited on his execution against *Elliott,* and then took possession of the premises. The object of this transaction was, to accommodate and benefit *Horner,* and to enable *Vance* to get up his note.

In 1816, *Armstrong,* the complainant, purchased the lot from *Horner* for 300 dollars, entered into possession, and made valuable improvements; and, in 1819, having paid the consideration-money, he received from *Horner* a general warranty deed for the property.

*Elliott,* who had been absent from the country about 13 years, returned to *Lawrenceburgh* in 1819, about the time of the execution of the deed by *Horner* to *Armstrong.* Not long after *Elliott's* return, the recorder called on him with the deed which had been made to him by *Vance* in his absence, and demanded the recording fee. *Elliott* at first refused to pay and take the deed; but on being sued by the recorder, he paid the fee before the trial, and received the deed. He soon afterwards, to wit, in 1819, brought an action of ejectment against *Armstrong* for the lot; and, in 1821, recovered a judgment against him, on the ground that the execution against *Elliott,* under which *Horner* had purchased the premises, was utterly void, and the sheriff's sale a nullity.

In 1823, *Armstrong,* for a valuable consideration, released *Horner* from the covenant of warranty, contained in *Horner's* conveyance to him of the premises in dispute.

This statement, we believe, contains all the material testimony given in the cause. The decree of the Circuit Court is in favour of the complainant, requiring the defendant to convey to him the legal title to the lot, and enjoining him from

proceeding any further at law, &c. The defendant appeals to this Court.

The complainant in this suit admits, that the *legal title* to the lot which he claims, is vested in the defendant. But it is contended, that the *beneficial property* is in the complainant; and that the defendant is bound to convey to him the *legal estate.* It is not to be questioned, but that the quality of separability of the *use* from the *legal title*, as contended for by the complainant, does exist in real property. One man may certainly have the legal estate merely as a *trustee*, whilst another, called the *cestui que trust*, has a right, in equity, to demand the rents and profits and a conveyance of the legal title. This *trust-estate* in real property, as separate from the *legal ownership*, may either be created by an express declaration of the trust; or it may be raised upon certain facts by implication of law. The statute of frauds requires all declarations of trust in land to be *proved by* written testimony; but those trusts which arise by the mere operation of law, are excepted out of the statute, and may be proved by parol evidence. The complainant here does not rely upon any express declaration of trust in favour of his grantor. He goes upon the ground, that *Horner* paid the consideration for the lot; and that, by virtue of such payment, although the deed was made to *Elliott*, a trust resulted to *Horner* by implication of law. And there is no doubt but that the law upon this subject is, that if *A.* purchase land *with his own money*, and the deed be made to *B.*, a trust results in favour of *A.*; provided there be no circumstances in the case to rebut this presumption of the law.

Some of the points taken by the defendant, in opposition to the complainant's demand, are very easily disposed of. He contends that *Horner* should have been a party, either complainant or defendant. The suit is by *Armstrong*, the grantee of *Horner*, against *Elliott*. There existed no interest in *Horner*, therefore he needed not to be a party complainant; and, as there was nothing demanded of him, there was no occasion for his being a party defendant. *Kerr* v. *Watts*, 6 Wheat. 550, 559. In the case where an assignee of a mortgage brings a bill of foreclosure, it is held that the mortgagee need not be a party. *Whitney* v. *M'Kinney*, 7 Johns. Ch. Rep. 144, 147. We think there is nothing in this objection. The ground relied on

by the defendant, that his parol contract with *Vance* gave him an equitable estate, and that *Horner* was a purchaser with notice, has no foundation. If that contract of 1805 was originally binding on the vendor, we have no idea that it could remain so, after the defendant had pledged the note at *Cincinnati*, which was to have been given up as the greater part of the consideration for the lot; and after he had absented himself from the country for 7 years, without having paid or offered to pay any part of the consideration. 1 Maddock's Ch. 328. It is contended that, assuming *Horner* to be the *cestui que trust*, he could not sell the property to the complainant as set out in the bill. The law, however, is perfectly settled, that the estate of a *cestui que trust* may be conveyed as well as any other. 1 Cruise, 493. The defendant relies upon the release by the complainant to *Horner*. That release, however, is merely of the covenant of warranty in *Horner's* deed to the complainant, and leaves the case just where it would have been, had the deed originally contained no covenant of warranty. The conveyance of the estate is as valid without that covenant as with it. Another ground taken by the defendant is, that when *Horner* purchased the lot at the sheriff's sale under his judgment against *Elliott*, his trust-estate, if he had any, was merged in the legal title thus acquired. The answer to this objection is, first, that if *Elliott* was a bare *trustee*, the estate was not subject to the execution against him; 1 Maddock's Ch. 363, 1 Cruise, 542; secondly, that the sale was at any rate a nullity, and vested no property in the purchaser, the execution being void. Such, was the decision of this Court, in a case between these same parties, at the *November* term, 1822. *Horner* therefore acquired, under the sheriff's sale, no legal title by which his equitable right, if he had any, could have been merged.

These comparatively unimportant matters, introduced into the argument by the defendant, being thus disposed of, we come now to an examination of the substantial merits of the cause.

There are two principal questions involved in this suit:—— First, did *Horner* pay the consideration, or any part of it, for the lot in dispute, *out of his own money?* And if so, then, secondly, is the presumption of law, thus raised in favour of *Horner*, destroyed by any rebutting evidence on the part of the defendant?

Previously to our examining these questions, it may be pro-

per to observe, that some of the depositions contain the general expressions, that *Horner* paid the whole of the consideration-money, and that the deed was made to *Elliott* for the sole benefit of *Horner*. If these general expressions stood alone, they would probably settle the case, at once, in the complainant's favour; notwithstanding the deed states upon its face, that the consideration was paid by the defendant, and the answer denies the trust. *Boyd* v. *M'Lean*, 1 Johns. Ch. Rep. 582, 586. These expressions, however, are explained and modified in other parts of the same depositions. We find, that when these witnesses say that *Horner* paid the consideration-money, they mean that he paid it by getting the note against *Vance* and *Dill* from *Ruffin*, delivering it up to *Vance*, and paying the difference between the note and the price of the lot. And when they say, that the deed was made for *Horner's* benefit, their meaning is, that the absolute title was vested in *Elliott* to benefit *Horner*, by thus rendering the lot subject to his judgment against *Elliott*.

The first subject for our inquiry is, whether *Horner* paid, *out of his own money*, the consideration for the lot?

With respect to this point, the testimony is clear that a promissory note, given many years before by *Vance* and *Dill*, and payable to *Elliott or order*, was delivered up to *Vance* by *Horner*, as the principal part of the consideration for the lot. But it is a great matter of dispute between the parties, as to whom that note properly belonged at the time it was so delivered up to *Vance;* to wit, in *October*, 1812. The complainant contends, that it was the property of *Horner*. It is in proof that, in 1806, this note against *Vance* and *Dill* was *delivered* by *Elliott* to *Ruffin*, without endorsement, as a collateral security; to be collected by him, in case he should have to pay the debt of about 66 dollars due to *Vattier*. This was certainly no sale of the note to *Ruffin*. It was a mere pledge for the security of a debt; and the general property of the note, at all events, continued in *Elliott*. By this pledge, *Ruffin*, at most, had but the special property and the right of possession, which belong to a bailee: and even after he had paid *Vattier*, probably in 1807, he was only entitled to collect the note in *Elliott's* name, and pay himself for his advance to *Vattier*, out of the proceeds.

In 1812, this pledged note was sold by *Ruffin*, the pledgee,

to *Horner;* and it is upon this sale alone, that *Horner's* right to the note, when he delivered it to *Vance,* is founded. That *Ruffin* had no power to sell this note in 1812, is contended for by the defendant, on the ground that *Ruffin* had been, a year and a-half before, repaid the debt for which the note was pledged. It is evident, from *Ruffin's* calling upon *Vance* in 1807 for payment, and from his inquiries of *Percival* in the same year, if *Elliott* had left any property that he could attach, that *Ruffin* was determined to be re-paid very soon, if possible. We have the positive testimony of *Percival,* the defendant's agent, that when thus inquired of by *Ruffin,* to wit, in 1807, he gave him the note against *Brown,* which was for 87 dollars and 50 cents, and told him to make his money out of that. It is proved that afterwards, in the same year, a judgment on this note against *Brown* was obtained in *Elliott's* name at *Cincinnati,* where *Ruffin* lived; that when the sheriff gave to his deputy an execution in the case, he directed him to pay over to *Ruffin* any money he might collect on it; that the deputy sheriff asked and received instructions in this business from *Ruffin;* and that the whole amount of this judgment against *Brown,* was finally collected on execution, during *Elliott's* absence from the country. We have also in evidence the receipt itself to the sheriff for 82 dollars, signed by *Ruffin,* dated long before his sale to *Horner* of the pledged note, to wit, the 12th of *October,* 1810, and expressed to be in part payment of the execution in this case. These are strong proofs of the re-payment to *Ruffin,* in the manner and at the time alleged by the defendant.

The complainant has attempted to weaken the force of this testimony, by the deputy sheriff's statement, that he had seen a receipt for 50 dollars and 50 cents in the case against *Brown,* given by *Thomas,* he thinks, as attorney; and by *Horner's* deposition, that *Ruffin* had told him that what money he had received on the judgment against *Brown,* he had paid to *Percival.* These circumstances amount to nothing. The receipt of *Thomas* was not produced, nor was its absence accounted for. Besides, *Thomas's* authority does not appear, *St. Clair* being the only attorney on record. As to what *Horner* says, relative to *Ruffin's* telling him that he had paid to *Percival* the money due from *Brown,* it is mere hearsay testimony. *Ruffin* himself was

a witness in the cause; and if he had not received or retained the money, for which he receipted to the sheriff, he was the proper person to be called on to explain the transaction. *Percival*, too, was a witness; and he could have told whether *Ruffin* had ever paid to him this money. The complainant, however, did not think proper to ask either *Ruffin* or *Percival* a single question on this subject; and he must consequently submit to the presumption against his secondary evidence, which the want of that inquiry necessarily creates.

The defendant's evidence, therefore, on this part of the case, stands unimpeached, and settles the fact, that in 1810 *Ruffin* received 82 dollars from *Elliott's* judgment against *Brown*. That amount was at least equal to *Ruffin's* claim for having paid the debt due to *Vattier;* which, in 1807, did not exceed 66 dollars. It follows, that in 1810 the debt was paid to *Ruffin*, to secure which the note against *Vance* and *Dill* had been pledged to him. That payment to *Ruffin* put an end to his control over the pledged note. From the time of that payment, the absolute right of property and the right of possession in the note, were vested in *Elliott*. The consequence is inevitable,—the sale of the note in 1812, about a year and a-half after the payment of the debt for which it was pledged, was made by *Ruffin* to *Horner* without authority; and this unlawful conversion of *Elliott's* property, subjected *Ruffin* to an action of trover.

Perhaps, however, it may be said that *Horner*, by the purchase from *Ruffin* for a valuable consideration, became the owner of the note, although *Ruffin*, at the time, had no property in it, nor any authority to sell it. In the sale of personal property, not in market overt, the general rule is, that though the purchase be *bona fide* and for value, the purchaser can receive no better title than that of which the seller was possessed; and must, at all times, yield to the claim of the rightful owner. To this general rule, however, there is an exception in favour of negotiable instruments, such as bills of exchange and promissory notes. When these are originally made payable to bearer; or when, in the first instance, they are payable to order and afterwards by a blank endorsement become payable to bearer; they pass by *delivery:* and the purchaser of them who uses due caution, pays a valuable consideration, and takes them in the course of business, has a good title against all the

world, whether the seller had any title or not. *Wookey* v. *Pole,* 4 Barn. & Ald. 6. Upon looking at this note, which was pledged to *Ruffin* and sold by him to *Horner,* we find at once, that it is not that kind of negotiable instrument which comes within the exception in favour of commerce. It was payable only to *Elliott or order,* and *Elliott* had not endorsed it, nor had any person for him; consequently it was not payable to bearer, and could not, like a bank note, be transferred by a bare delivery. Whether the property in this note could pass without endorsement, under any circumstances, need not be considered. Supposing it could, the transfer in such case must be governed, not by commercial law, but by the rules which regulate the sale of ordinary goods, out of market overt. *Horner* could receive no better title than *Ruffin* had. The buyer was not liable to any imposition in this case, the want of *Elliott's* endorsement being sufficient notice that the note was still his; and when *Horner* bought it, he did so at the risk of *Ruffin's* having no authority to sell it. This would be the case, even if *Ruffin* had endorsed the note in *Elliott's* name, having no authority to do so: because the law is, that if one man acts by the authority of another, those dealing with him must look to his authority. *De Bouchout* v. *Goldsmid,* 5 Ves. Jun. 211. This part of our case, is explained by the following authority: *Maclish* being owner of a ship, let it to the commissioners of the navy; and by a letter of attorney empowered *Todd* to receive the profits, give discharges, and do every thing relative to the premises which *Maclish* could do. *Todd* received from the commissioners of the navy, a navy bill for 1200 pounds payable to *Maclish* or his assigns; and sold it to *Hawkes* for a fair price; and *Hawkes* for a fair price sold it to *Ekins.* *Maclish* afterwards brought an action of trover against *Ekins* and recovered. The Court observed that it had been truly said, that the property in a bank note, if delivered in the course of trade for a valuable consideration, does pass by delivery: but that it is as true, that the property in a navy bill cannot pass without assignment; and as *Todd* had no power to assign the bill, the maxim *caveat emptor* applied to the case. *Maclish* v. *Ekins,* Sayer's Rep. 73.

With respect to this part of the case, therefore, it appears to us, that at the time of the sale of the note against *Vance* and *Dill* by *Ruffin* to *Horner,* to wit, in 1812, the debt had been

paid for which the note was pledged, and that the right both of property and of possession in it was then in *Elliott;* that *Ruffin* had no authority to dispose of the note; and that as it was payable only *to order*, and was not endorsed, *Horner* acquired no property in it, although he paid for it a valuable consideration.

As the delivering up of this note to *Vance*, formed the greater part of the consideration for the lot in dispute; and as the payment of that consideration by *Horner* out of his own money, is the foundation of the complainant's bill, this decision,— *that Horner never had any property in that note,*—goes very far towards settling the whole of this case.

The trifling balance of the consideration for the lot, was paid by *Horner* out of his own money. Whether the smallness of this sum is any objection to the complainant's following it into the lot, if he be otherwise entitled, we shall not stop to inquire; but we will take it for granted that it is no objection. This introduces the second principal subject of inquiry, which is, whether the *presumption* of a trust to *Horner*, arising from this payment, is rebutted by the defendant's evidence?

From an examination of the testimony, it appears to us that the object of *Horner*, in paying this little balance to *Vance*, was not to make a purchase from him of a beneficial estate in the lot in proportion to that amount. It seems to have been paid for *Elliott* by *Horner*, merely to induce *Vance* to perform his contract with *Elliott* by conveying to him the *absolute title*, and thus to cause the lot to be made subject to *Horner's* judgment against *Elliott.* The following extract from the deposition of *Horner's* attorney, very clearly explains this part of the case; though the occasion, really, seems not to require so particular a reference to it:—

"In 1810, or 1811, after this deponent had commenced the practice of law, he, together with *Symmes*, was employed by *Horner* to sue out and conduct an attachment against *Elliott*, either as an absconding or non-resident debtor; and they prosecuted the suit to final judgment, which was obtained in *June*, 1811. In *March*, 1812, *Symmes*, *Horner*, and the deponent, consulted together on the best probable method of securing *Horner's* debt; and inasmuch as lots in *Lawrenceburgh* had then considerably increased in value, and might still increase, they

May Term,
1829.

ELLIOTT
v.
ARMSTRONG.

concluded *Horner's* best method would be to perfect *Elliott's* title to the lot, if *Vance* would consent, and then to execute and sell, and become the purchaser. *Horner*, the deponent, and perhaps *Symmes*, went to *Vance*, and inquired of him whether, if *Horner* paid up and fulfilled *Elliott's* contract, he, *Vance*, would make the title to *Elliott?* After some conversation with *Vance*, and perhaps some persuasion from the deponent, *Vance* consented, more especially as the deponent urged the matter as the only method likely to secure *Horner*. *Horner* then went to *Cincinnati*, and purchased the note against *Vance* and *Dill*, (as deponent supposed, because he returned from thence with the note in his possession.) He delivered the note to *Vance*, and paid the residue of the purchase-money for the lot, which was in all perhaps 75 dollars. We then executed and sold the lot as *Elliott's* property, to wit, lot numbered 171, in the town of *Lawrenceburgh*, and *Horner* became the purchaser for 75 dollars, as the deponent believes."

This deposition certainly shows, that here was no new bargain and sale between *Vance* and *Horner*. It was the merely carrying into effect the old contract between *Vance* and *Elliott*. This, it is true, was to be for *Horner's* benefit; not, however, by vesting in him the beneficial estate in any part of the lot, because the performance of *Elliott's* contract could not do that; but it was to be for his benefit, by vesting in *Elliott* the beneficial as well as the legal interest, and so rendering the lot subject to *Horner's* judgment against him. No words could make the matter plainer than this deposition does. The resulting trust, contended for by the complainant, is, in the language of Lord *Mansfield*, a kind of *arbitrary implication* raised, to stand until some reasonable proof brought to the contrary. Sugd. 418. Supposing that the payment of the small balance of the consideration, had it stood alone, would have raised a *presumption*, that the deed, though made to *Elliott*, gave a beneficial estate in the lot to *Horner* in proportion to that small sum; yet, undoubtedly, this *mere presumption* of law must yield to the *truth* of the case, when it is shown by positive testimony, that the object of *Horner* in making this payment was, in direct opposition to such a *presumption*, to cause the beneficial estate to be vested in *Elliott*, conformably to the face of the deed; and when it is shown, too, that after the execution of the deed;

*Horner* treated the lot as *Elliott's* property, by having his execution levied upon it as such, and buying it himself at the sheriff's sale.

This management of *Elliott's* business for him in his absence, by *Horner*, was ratified by *Elliott* soon after his return to the country; and the special benefit which had been contemplated by *Horner*, was thus confirmed to him. Upon *Elliott's* acceptance of the deed, the case stood precisely as if his contract with *Vance* had been completed by himself in person, instead of by *Horner* for him. By this recognition, *Elliott* became accountable to *Horner* for the balance of the consideration over and above the note, which had been advanced for him; and the liability of the lot, as *Elliott's* property, to *Horner's* judgment against him, from the date of the deed, was thereby established.

It appears to us, therefore, that the facts accompanying the small advance of money by *Horner* for *Elliott*, repel the idea of any implied trust *pro tanto*, in favour of *Horner*, on account of that payment. Indeed, it seems perfectly clear, that it was 8 or 10 years, at least, after *Vance's* deed to *Elliott*, and when the sheriff's sale to *Horner* had been determined to be void, and after *Elliott* had recovered the premises in the action of ejectment, that the complainant, looking around for a plank in the shipwreck, was the *first* to think of the resulting trust set out in his bill.

It may be supposed, perhaps, that we should notice, before we conclude, the suggestions of mistake and fraud, made by the complainant for the purpose of showing, that the defendant has no right to resist the claim of a resulting trust set up in the bill. It is true, that *Horner* was under a mistake in supposing the lot to be *Elliott's*, when he levied his attachment; but it is also true, that before he had thought of completing *Elliott's* contract, that mistake was rectified, since he had discovered before that time, as he states himself, and as the bill states, that *Elliott* had no title at law or in equity. As to the idea of *Horner's* mistake of judgment in not causing the deed to be made to himself, instead of to *Elliott*, we have nothing to do with that. We will observe, however, that as the note was *Elliott's* at the time, the policy of taking the deed to *Horner*, was not so clear as the complainant imagines. It is further contended, that

May Term,
1829.

there was a fraudulent concealment, by the defendant or his agent, of the claim now set up against the alleged trust. We have not been able, however, to discover any fraud in the case. The defendant was absent himself, and knew nothing of the proceedings. If his agent saw the complainant buying the lot, and making improvements on it, he might honestly think, as the complainant did, that the sheriff's sale to *Horner* was valid, and that *Elliott* had no further claim. There is no proof, that the discovery of the execution's being void, was made until after *Elliott's* return and acceptance of the deed in 1819, nor indeed at any time before the commencement of his action of ejectment.

From the general view which we have now taken ·of this cause, we have come to the conclusion, that the greater part of the consideration of the lot was the property, not of *Horner*, but of the defendant; and that the small balance of it, paid by *Horner*, was paid under circumstances which entirely rebut the presumption of a resulting trust. We are also of opinion, that there was no mistake or fraud, that can have any influence on the case. The consequence is, the complainant is not entitled to the relief prayed for, and the Circuit Court should have dismissed his bill upon the merits. The decree of that Court, in favour of the complainant, is erroneous, and must be reversed.

*Per Curiam.*—The decree is reversed with costs. Cause remanded, with directions to the Circuit Court to dismiss the bill, &c.

*Caswell, Starr,* and *Dunn,* for the appellant.
*Lane* and *Stevens,* for the appellee.