MARION TRUCKING COMPANY, INC. *v.* HARWOOD
TRUCKING, INC., ET AL.

[No. 18,368.  Filed January 14, 1954.  Rehearing denied
July 9, 1954.  Transfer denied October 4, 1954.]

*Campbell, Gemmill, Browne, Ewer & Torrance,* of Marion, *Davis, Hartsock & Dongus,* of Indianapolis, *Mote & Wall,* of Wabash, and *John O. Campbell, Gustav H. Dongus, Donald R. Mote,* and *Merl M. Wall,* of counsel, for appellant.

*Pieroni, Pieroni & Hynes,* of Muncie, *Batton, Harker & Rauch,* of Marion, and *Charles Pieroni,* of Muncie, *Robert R. Batton, George W. Rauch,* of Marion, and *Eugene M. Weesner,* of Wabash, of counsel, for appellees.

BOWEN, J.—This is an appeal from a judgment in an action for specific performance of a written contract for the sale and purchase of certain interstate certificates of public convenience and necessity issued by the Interstate Commerce Commission and held by the appellee. Appellee also agreed to sell appellant its intrastate certificates, but such part of the transaction is not in controversy here. The issue involved in this appeal is whether appellant is entitled to have specific performance of a contract of July 7, 1944, providing for the sale and transfer of appellee's interstate operating rights to appellant.

Issues were joined on appellant's second amended complaint for specific performance and answer by appellee in sixteen separate paragraphs containing admissions, denials and affirmative defenses and a counterclaim filed by appellee in two paragraphs, the first paragraph of which alleged breach by the appellant of the contract between the parties of July 7, 1944, and the second amended paragraph in tort for vexatious litigation and interference with appellee's business, and the answer and reply of the respective parties to the foregoing pleadings. In addition, appellant filed two supplemental complaints solely for the purpose of showing extensions of time granted by the Interstate Commerce Commission in which to consummate the sale and transfer of appellee's operating rights to appellant.

By the terms of the contract the appellant paid $5,000 to The Upland Bank as escrow agent, and the

appellee bank has filed disclaimer and tendered $5,000 to be paid to such persons as the court may direct. Any subsequent reference to the appellee in this appeal will have reference to the appellee Harwood Trucking, Inc.

After a trial by the court without a jury the court entered its decision and finding for appellee and against the appellant on the complaint, and found against the appellee on its counterclaim, and found that the $5,000 placed in escrow with The Upland Bank in the hands of the clerk be returned to appellant. The court overruled appellant's motion for a new trial and this appeal followed.

Legal grounds of appellant's motion for a new trial are that the decision of the court is not sustained by sufficient evidence and is contrary to law. The specification that the decision of the court is not sustained by sufficient evidence presents no question to this court because the burden was upon the appellant to establish the allegations of the complaint and therefore a decision against appellant cannot be attacked upon the ground there is insufficient evidence to sustain it. *Pokraka* v. *Lummus Co.* (1952), 230 Ind. 523, 104 N. E. 2d 669; *State ex rel. Flaugher* v. *Rogers* (1948), 226 Ind. 32, 77 N. E. 2d 594.

From the record it appears that appellee is an Indiana corporation organized by one Max Harwood in 1943 for the purpose of acquiring certain certificates of public convenience and necessity issued by the Interstate Commerce Commission authorizing interstate operations as a common carrier by motor vehicle. These rights were acquired by the appellee from one Gas City Transfer Company, Inc., and are the same operating rights described in the contract of July 7, 1944, which is the subject of this suit for specific performance, and in which contract the appellee contracted to sell such

rights to the appellant. One Max Harwood was president and the principal stockholder of appellee company and the other officers and directors were his wife and brother.

On July 7, 1944, a contract was negotiated between appellant and appellee for the sale to appellant of appellee's operating rights which had heretofore been acquired by it from the Gas City Transfer Company, Inc., together with an intrastate certificate which is not in controversy here. By the terms of the contract appellant agreed to pay $50,000 in installments, and pursuant to the contract appellant paid $5,000 to the Upland Bank in escrow. The contract contained a further provision that "the Seller further agrees that it will sign all petitions and will furnish such information and exhibits as may be required by Interstate Commerce Commission . . . ., and will cooperate in securing the approval of sale and transfer of said operating rights by attending any hearings and furnishing witnesses." The contract further provided that "the Seller further agrees that it will continue operations under said operating rights to the extent of its available facilities and will not permit said operating rights to lapse because of non-user. It is further agreed and understood that in the event the parties hereto desire to enter into a lease arrangement covering said operating rights pending final approval by Interstate Commerce Commission, the parties hereto shall enter into an agreement whereby the Seller shall lease said operating rights to the Purchaser to be effective upon approval by Interstate Commerce Commission, at an agreed monthly rental of Two Hundred Fifty Dollars ($250.00) per month. It is further agreed and understood that in the event said lease agreement is entered into by the parties and approved by Interstate Com-

merce Commission, that the Purchaser shall · conduct all operations during the term of said lease at its own cost, risk and expense, and shall indemnify and save the Seller harmless from any and all claims and demands by reason of operations under said lease."

On July 28, 1944, appellant and appellee filed with the Interstate Commerce Commission their joint application for authority under Section 5 of the Interstate Commerce Act (49 U. S. C. A., §5) to carry out the purchase and sale agreement. On July 29, 1944, appellant and appellee entered into a written lease providing for the leasing by appellant of appellee's interstate operating rights for a period not exceeding 180 days from the date of approval of such lease ·by the Interstate Commerce Commission for which appellant agreed to pay appellee $250 per month. By Section 210(b) of the Interstate Commerce Act (49 U. S. C. A., §310(b)), pending approval of an application of the purchase of properties of a motor carrier, the Interstate ·Commerce Commission may grant temporary authority to the purchaser, for a period not exceeding 180 days, to operate the properties proposed to be. acquired. On July 31, 1944, appellant and appellee filed with the Commission their joint application for approval of the temporary lease, and on September 12, 1944, the application was approved by order of the Commission. Pursuant to the· directions in that order, appellant and appellee entered into an amended lease on September 20, 1944, for the period of 180 days "from September 12, 1944, and ending March 10, 1945, or until the Interstate Commerce Commission shall either grant or deny Lessee final authority to purchase said operating rights from Lessor." The amended lease provided for the same rental of $250 per month. During such period of 180 days, appellee ceased. operations

as an interstate motor carrier and only operated as an intrastate carrier in Indiana, and appellant operated under appellee's interstate certificates and continued its contract-carrier operations.

On November 1, 1944, the Interstate Commerce Commission, through Examiner Higgins, held a public hearing at Indianapolis on the pending application of the parties for the transfer and sale under the contract of July 7, 1944. On March 10, 1945, which was the date the 180-day lease and appellant's temporary authority expired, Division 4 of the Interstate Commerce Commission entered a report and order denying the joint application. This order made reference to possible dual operations on contract rights held by appellant and common carrier rights to be acquired by appellant from appellee, and the order recited that the "applicants have submitted no definite plan whereby the contract-carrier operating authority may be modified so as to permit a finding that the remaining dual operations would be consistent with the public interest. Considering all the circumstances of this case, and the pendency in another proceeding of the whole question as to the status of vendee, we are of the opinion that the public interest would best be served by leaving the operations of Harwood and Jaqua under present control, at least until vendee's status with respect to its present operations has been determined or until the parties submit a plan herein for elimination of specific contract-carrier authority of vendee and evidence that the remaining dual operations would be consistent with the public interest."

On March 15, 1945, appellant filed a letter with the Commission which it treated as a petition for reconsideration, setting forth all duplicating authority between appellant's permits and appellee's certificates

and consenting to the modification of any of its operating rights "to eliminate duplicating common and contract carrier authority and to eliminate dual operations between common points." The parties of record were served with a copy of such letter on March 24, 1945.

Within a day or so after the Commission made its order of March 10, 1945, denying approval of transfer of property between the parties, the appellant's officers and appellee's president went to Washington, D. C., in an attempt to find out the cause of their failure to secure approval of the transfer. The parties spent from 24 to 48 hours in Washington and on the way home the appellee's president, Max Harwood, asked the appellant's president, Ralph Marcuccilli, "What in the world am I going to do when I get back? From all indications, I am going to have to go back in operation." Marcuccilli replied, "Well, you are no worse off than you were before." Harwood claims that Marcuccilli suggested that he would buy Harwood's stock in the Harwood company for $10,000.

Following Max Harwood's return from Washington, and about March 17, 1945, he sent a telegram to the Interstate Commerce Commission opposing appellant's acquisition of appellee's operating rights. Thereafter, the appellee actively engaged in the opposition of the procuring of a favorable ruling by the Interstate Commerce Commission of the transfer of this property to appellant.

As a result of subsequent petitions for reconsideration the Interstate Commerce Commission on July 15, 1948, approved the transaction and transfer of appellee's operating rights to appellant and gave appellant additional time to exercise the authority granted.

On October 4, 1948, the Commission denied a petition

for reconsideration of its report and order of July 15, 1948, which petition was filed by appellee and others. Following such denial, on October 23, 1948, appellant tendered to appellee the sum of $7,500, being the value of the first installment payable under the contract of July 7, 1944, and made demand on appellee of the transfer of its certificates of convenience and necessity. The tender was refused, appellant paid the sum of $7,500 to the clerk of the court, and this suit followed.

The principal question to be decided in this appeal is whether the trial court abused its discretion in refusing to grant specific performance of the contract in question.

The equitable remedy of specific performance is not available as a matter of right, *Vawter* v. *Bacon* (1883), 89 Ind. 565; *Boldt* v. *Early* (1904), 33 Ind. App. 434, 70 N. E. 271, and may be resisted on weaker grounds than are necessary for its maintenance, and the granting of such relief rests in the sound judicial discretion of the trial court. However, it must be borne in mind that such equitable remedy of specific performance is not one which rests upon the whim or vagary of the trial judge, or as sometimes expressed, it may not vary with the length of the chancellor's foot. As stated in 65 A. L. R. at p. 14:

> "Although the language of the cases previously referred to, relative to the discretionary powers of the court to require the specific enforcement of contracts, is so broad as to make the power apparently unlimited, obviously, such a broad power cannot vest in each particular chancellor. If it did, this character of relief would be in a chaotic state. In this respect an examination of the actual holdings of the different courts on the subject discloses that, while the relief afforded by the specific performance of contracts is purely equitable, and is given as a substitute for the legal remedy of compensa-

tion whenever the remedy at law is inadequate or impracticable, yet the granting of the equitable remedy is uniformly deemed a matter of sound judicial discretion, controlled by established principles of equity. Hence, by the terms 'sound' or 'judicial' discretion is meant merely that the right of the plaintiff to a decree specifically enforcing a contract is circumscribed and limited by established equitable rules."

This court stated in *Ames* v. *Ames* (1910), 46 Ind. App. 597, 91 N. E. 509:

"It is also a settled principle of equity that the enforcement of specific performance of a contract is not a matter of right, but rests in the sound discretion of the court, and the court will do what seems just and equitable under the peculiar circumstances of the particular case. *Boldt* v. *Early* (1904), 33 Ind. App. 434, 104 Am. St. 255; *Ratterman* v. *Campbell, supra*. But this discretion is not an arbitrary one. It must be governed by the well-settled principles of equity. 1 Story, Eq. Jurisp. (11th ed.) Sec. 742."

There were a number of defenses interposed by appellee in the court below. The appellee contends that the appellant failed to show that its remedy at law was inadequate and that there is no evidence showing that the particular certificates involved in the controversy are unique in value. Although the general rule is that equity will not grant specific performances of contracts involving personal property, a well recognized exception is in the case of personal property having a peculiar and unique value since damages at law would be inadequate. 4 Pomeroy, Equity Jurisprudence (5th Ed.), §1402, pp. 1034-5; 49 Am. Jur., Specific Performance, §§126-129, p. 148, et seq.

There is no question but that the right to operate a particular part of an interstate transportation system

is a unique property interest which cannot be obtained or transferred without Interstate Commerce Commission approval. Also, by way of comparison, it is obvious and axiomatic that right to transport commodities for hire over any particular land route is as unique in character as the unique value which attaches to any particular piece of real estate and cannot be duplicated.

Appellee's main contention in support of its defenses, which are upheld by the trial court, are grounded upon the claim that the order of Division 4 of the Interstate Commerce Commission on March 10, 1945, was a final order as contemplated by the parties to the contract, and that thereafter the appellee, Harwood Trucking Company, was no longer under any obligation to perform under the contract after that date. Appellee further asserts that the parties contemplated that the liability of appellee to transfer this property in any event did not extend beyond the 180-day period of the lease agreement pending approval by the Interstate Commerce Commission. We are unable to find from the contract between the parties, the lease agreement or the record in this case any basis for a holding that the time within which the contract was limited for the securing of Interstate Commerce Commission approval was the 180-day period specified in the lease agreement. The lease agreement did not so provide and the original contract itself contained an express provision that the appellee seller, Harwood Trucking Company, agreed that it would continue operations under said operating rights pending final approval by the Interstate Commerce Commission. It is so well settled as not to require the citation of authority that where no time for performance is specified in a contract the law implies that it must be per-

formed within a reasonable time. The record in the instant case justifies the premise that the contract in the beginning was generally fair and equitable. The appellee's contention is that by the contracts and agreements between the parties, and the acts of the parties at the time of the entry of the order by Division 4 of the Interstate Commerce Commission denying approval constituted a termination of the contract and that appellee was no longer bound to perform thereunder. In this connection it must be borne in mind that the appellee did not plead the defenses of rescission or mutual abandonment which must be directly pleaded in an action for specific performance. 81 C. J. S., Specific Performance, §136.

It must also be borne in mind that the order which the appellee insists is a final order within a meaning of the original contract was not an order of the full Commission. The order of March 10, 1945, was in the nature of an interlocutory order. If no further administrative steps had been taken that order would have been final except for the purposes of judicial review. However, at the time such order was entered it was not a final order for the purpose of judicial review in a district court of the United States. *Holmes* v. *United States* (S. D. N. Y., 1949), 89 F. Supp. 894, affirmed 339 U. S. 927. In that case the court said at p. 896:

> ". . . we must consider the defense set up in the answers of the United States and the Commission, namely, that the Court lacks jurisdiction because the plaintiffs have failed to exhaust their administrative remedy in accordance with section 17 (9) of the Interstate Commerce Act, 49 U. S. C. A. Sec. 17(9). The section requires that rehearing, reargument or reconsideration by the full Commission be sought prior to judicial review by an order by a Division of the Commission."

On March 15, 1945, the appellant filed a petition for reconsideration of the order of Division 4 denying the joint application. Also, at this stage of the proceedings, the president of appellee company sent a telegram to the Interstate Commerce Commission opposing appellant's acquisition of appellant's operating rights, and thereafter the appellee actively engaged in opposition to the procuring of a favorable ruling by the Interstate Commerce Commission. This is certainly positive proof that the appellee did not consider that such order was final, and in equity the appellee could not complain of any delay in the granting of Interstate Commerce Commission approval after the date it began such active opposition and it would also be estopped to assert such delay as a defense in its failure to perform the contract.

While the law is well settled that unexpected delay in the happening of the contingency upon which the performance depends is cause for refusing the specific performance of an agreement, none of the authorities cited by the appellee are cases in which the parties seeking to use such delay as an excuse for non-performance was the contributing fault of the delay, and in the instant case it clearly appears that the appellee attempted, prior to the expiration of a reasonable time for the securing of Interstate Commerce approval, to thwart such approval. *Myers* v. *Cicott* (1839), 5 Blackf. 225; *Elliott* v. *Armstrong* (1829), 2 Blackf. 198; *Longworth* v. *Conwell* (1831), 2 Blackf. 469.

Another contention advanced by the appellee is that the appellant did not make a proper petition in the first instance with the Interstate Commerce Commission and that such failure on appellant's part resulted in the refusal of Division 4 to grant approval. This is not a reasonable inference to be drawn in view of the

fact that there does not seem to be any evidence of bad faith on the part of appellant sufficient to justify the court in denying specific performance.

It is clear from the contracts and agreements of the parties herein that there was an implied obligation to attempt in good faith to secure the prerequisite of the Interstate Commerce Commission's approval which rested upon both parties. Therefore, it appears that the appellee's defense based upon a claim of lack of mutuality in the contract fails. Furthermore, there appears a lack of good faith as demonstrated by appellee in complete repudiation of the contract, and an attempt to defeat Interstate Commerce Commission approval.

By reason of the conclusions reached herein the appellant was entitled to specific performance of the contract in question at the time of the original suit, and to the transfer of the operating rights existing at such time and agreed to be transferred by the contract between the parties.

Judgment reversed with instructions to sustain appellant's motion for a new trial.