# MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Oct 31 2019, 6:33 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT
ANTHONY L. ELROD

Michael F. Vertesch
Greenwood, Indiana

ATTORNEY FOR APPELLANT
NANCY DAVIS

Andrew B. Arnett
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE
RAYMOND C. BAUMAN

Jeffrey J. Jinks
Elizabeth R. McAleese
Carmel, Indiana

## IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Anthony L. Elrod, et al., *Appellants-Defendants,* | October 31, 2019 |
| v. | Court of Appeals Case No. 18A-PL-3020 |
| | Appeal from the Marion Superior Court |
| Raymond C. Bauman, *Appellee-Plaintiff.* | The Honorable Patrick J. Dietrick, Judge |
| | Trial Court Cause No. 49D12-1604-PL-11727 |

**Bailey, Judge.**

# Case Summary

Anthony L. Elrod ("Elrod") and Nancy Davis ("Davis") (at times, collectively referred to as "Elrod") appeal an order, entered upon remand from this Court, enforcing Elrod's mediated settlement agreement with Raymond C. Bauman ("Bauman") ("the Mediated Settlement Agreement"). Determining that Elrod did not show a constitutional deprivation of due process, and the trial court did not err in interpreting the unambiguous provisions of the settlement agreement, but that questions of fact pertinent to enforcement of certain ambiguous provisions of the settlement agreement remain, we affirm in part, reverse in part, and remand with instructions to hold an evidentiary hearing.

# Issues

Elrod presents for our review the following restated issues:

  I.   Whether he was denied due process when the trial court restricted the evidence on remand to exclude witness testimony;

  II.  Whether the trial court erroneously interpreted the Mediated Settlement Agreement when it concluded:

       (a) Bauman could execute a quitclaim deed, rather than a warranty deed, to transfer his interest in property at 1041 High Street;

> (b) The assumption of mortgage payments by Elrod was to
> be effective August 1, 2016, with formal refinancing to
> follow;

> (c) Certain claimed expenses including management fees,
> storage fees, and repair costs were not authorized in the
> agreement;

> (d) Elrod must relinquish a claimed interest in an
> easement;

> (e) Elrod must transfer any interest in Lot 22/1030 High
> Street to Bauman; and

> III. Whether the trial court erroneously disposed of a potential
> claim as to South East Neighborhood Development
> ("SEND").

Davis presents the additional issue of whether the trial court erroneously ordered that she execute a quitclaim deed to Elrod, her brother, transferring her interest in 1041 High Street.

# Facts and Procedural History

The relevant facts were recited in the prior appeal, which gave rise to the order of remand underlying this appeal:

> For over thirty years, Bauman and Elrod were engaged in an
> ongoing business venture of buying, developing, and selling real
> estate in Indianapolis. Bauman and Elrod were also the owners
> of Madison Avenue Athletic Club, Inc. and M.A.C.C.
> Properties, LLC. Bauman contributed capital to the venture, and

Elrod managed the real estate.  When the business venture sustained a loss, Bauman contributed additional capital. Bauman eventually decided to end the venture with Elrod due to ongoing losses and Elrod's failure to provide Bauman with an accounting of how he managed the venture.

Accordingly, on April 4, 2016, Bauman filed a complaint seeking to appoint a receiver and for declaratory judgment to determine the rights and interests of the parties to the property and assets of the venture.  On June 13, 2016, the parties began court-ordered mediation.  After a full day of mediation, the parties signed the Mediated Settlement Agreement, which provides in relevant part:

Raymond Bauman (Ray) and Anthony Elrod (Tony) hereby *stipulate and agree* as follows:

1. [Elrod] will receive all right, title and interest to lots 1033-1035, 1037, 1039, 1041, 1045, 1047, 1049, and 1055 which are all lots bordered by High Street on the west and Prospect Street on the south.  [Elrod] will also receive all right, title and interest to the vacated alley due north of parcel 1033-35. [Elrod] will assume and be responsible for all debts, mortgages and other expenses of those parcels.  The mortgage on lot 1045 was executed by [Bauman].  [Elrod] will assume and pay that mortgage and indemnify and hold [Bauman] harmless from any nonpayment.

2. [Bauman] will receive all right, title, and interest to lots 330, 332, 336, and 340 as well as the four-plex and garage which are 1046-1048 and 1042.  Such properties are titled either in the name of [Bauman] and/or [Elrod] and MAAC[ ] Properties, Inc.  [Bauman] will assume and be responsible for debts, mortgages and other expenses owing with respect to these parcels.  [Bauman] will indemnify and hold [Elrod]

harmless for any nonpayment. [Bauman] will receive all shares equaling 100% of MAAC Properties, Inc.

3. The vacated alley that is due west of lot 330 shall remain in [Elrod]'s name unless it is purchased by the purchaser of the gym in which case [Elrod] will transfer his interest at no additional cost to Madison Avenue Athletic Club, Inc. If the gym purchaser does not purchase the vacated alley, upon closing of that sale, [Elrod] will deed the vacated alley to [Bauman] so long as [Bauman] remains the owner of the parcels 336 and 340 Prospect set over to him in paragraph 2 above.

4. Madison Avenue Athletic Club, Inc. owns all right, title, and interest to the gym property located at 306 E. Prospect. Such property is currently listed for sale with Ray Stuck. Each party agrees to cooperate with Ray Stuck in an effort to sell the property. Upon a sale of the gym, [Bauman] will receive the fixed sum of $175,000. Madison Avenue Athletic Club, Inc. shall execute a mortgage against the gym to memorialize this obligation, and the remaining proceeds shall be split on an equal basis. It is anticipated that payments will be made to Madison Avenue Athletic Club, Inc. and the parties will receive their share as distributions pursuant to the terms of this paragraph. Both parties agree that their respective ownership interest is 50/50. * * *

6. The parties agree that there [are] only 2 mortgages against the gym. Copies of each are attached hereto. Both mortgages shall be released of record by [Bauman].

7. The liquor license associated with the gym is held in the name Madison Avenue Athletic Club, Inc. In the event it is not required as part of the sale [of] the gym, [Bauman] and

[Elrod] will market the liquor license and split any net proceeds on an equal basis.

8. The gym and the apartments operate on a long-term lease for parking spaces on the south side of Prospect Street. That area referred to as the parking lot is to be retained by the parties, MAAC Properties, Inc. and/or Madison Avenue Athletic Club, Inc. In order to be fully marketable, the parking lot requires the installation of an additional parking lot directly east of the existing parking spaces. If either party invests that sum of money to install the parking lot in order to make the entire parcel marketable, the party who incurred such expense shall be refunded that amount of their investment from any sale proceeds. Remaining sale proceeds will be split on an equal basis.

9. [Elrod] has building materials, tools and supplies located in the basement of both of the apartment buildings and the second and third floor of 336 Prospect set over to [Bauman] by this agreement. He shall have all materials and personal property removed from the apartment buildings no later than October 15, 2016. He shall remove any and all personal property building materials or tools from the four-plex located at 1046-1048 no later than August 15, 2016. All coin operated laundry machines in the laundry rooms and appliances in use in the individual apartments shall remain and are not property of [Elrod]. If not removed by the due date, such property shall become [Bauman]'s property.

10. [Bauman] shall receive, as his sole property and free of any claims by [Elrod], the real estate located at 6427 Canna Court in Indianapolis. There is currently a judgment lien in Cause No. 49D07-1208-MF-031117 against [Elrod] which is lodged as a lien against this parcel. Upon a sale of the gym, an amount of money equal to the unpaid balance of that judgment shall be deducted from [Elrod]'s proceeds and

placed into escrow. [Elrod] shall have 10 months from the date hereof to obtain a release of the lien and if he does so, there will be no deduction from his gym proceeds and any escrow will be released. If he is unable to obtain a release within such time, [Bauman] shall satisfy the judgment from such escrowed funds. [Bauman] shall assume and agree to pay the mortgage that is in [Elrod]'s name and indemnify and hold [Elrod] harmless. [Bauman] shall satisfy the mortgage upon the sale of this property or any interest therein.

11. [Bauman] will also receive all right title and interest to 1027 East Raymond St. in Indianapolis, 2191 Wakeland Road in Paragon, 3711 Farrington Dr. in Bloomington and 2236-2238 Shelby St. in Indianapolis.

12. [Elrod] should receive all right title and interest to 3272 Clover Dr. in Plainfield. Such parcel is subject to a mortgage for which [Elrod] is solely obligated. [Elrod] will be responsible and assume the obligation to pay such mortgage and to indemnify and hold [Bauman] harmless with respect to such mortgage.

13. [Elrod] shall manage and operate the gym until it is sold and properly account for all income and expense. In the event either party contributes to such expenses, that party shall be given a note by Madison Avenue Athletic Club, Inc. for such loan plus interest at 4%.

14. The parties, either directly or through their various entities, shall ensure the proper transfer deeds are prepared transferring title to properties as set forth herein and to execute any and all documents deemed reasonably necessary to effectuate the terms of this mediated agreement.

15. Both parties agree to share the expenses of mediation on an equal basis[.]

16. [Bauman]'s attorney shall prepare the definitive settlement agreement encompassing and incorporating the terms of this agreement to be reviewed and executed by the parties. Upon its execution, the parties agree to dismiss this litigation as to all parties.

Appellant's App., Vol. 3, pp. 13-17 (emphases added).

On June 23, 2016, the mediator filed a report with the trial court indicating that mediation had been successful and that the parties had reached an agreement on the disputed issues. Bauman and Elrod subsequently took steps to implement the Mediated Settlement Agreement. For example: Elrod surrendered the keys of the apartment complex to Bauman; Elrod surrendered control and management of the apartments to Bauman; Elrod worked with Bauman to transfer all utilities at the apartments to Bauman; Elrod surrendered the rents received from tenants of the apartments to Bauman, which had previously been tendered to Elrod; Elrod filed the necessary documents with the Indiana Secretary of State to reinstate the status of the Madison Avenue Athletic Club, in order to facilitate the sale of the gym as called for in the Mediated Settlement Agreement; Elrod began removing building materials, tools, and supplies from both the Apartments and the four-plex; Elrod listed for sale the property located at 1045 High Street; Nancy Davis ("Davis"), the owner of record of the property at 1041 High Street, listed this property for sale; Elrod paid at least one month's mortgage on the Clover property; and Elrod obtained satisfaction of the judgment lien.

Pursuant to the terms of the Mediated Settlement Agreement, Bauman's counsel prepared a document titled "Confidential Settlement Agreement and Mutual Release" ("Agreement and

Release") along with the related deeds and other documents necessary to complete the distribution of the assets as agreed to under the Mediated Settlement Agreement. Bauman's counsel sent the documents, including the definitive settlement agreement draft to be signed. Elrod refused to sign the drafted agreement.

*Elrod v. Bauman*, No. 49A02-1703-PL-657, slip op. at 1 – 3 (Ind. Ct. App. Jan. 25, 2018).

[4]     Bauman filed an emergency motion to enforce the Mediated Settlement Agreement and the trial court ordered the parties to participate in a second mediation session. The second session was unsuccessful. Bauman filed a motion for summary judgment and a designation of evidence. Elrod did not respond. *See id.* at 4. However, counsel for Davis entered an appearance and requested an enlargement of time to respond to Bauman's motion. Ultimately, she filed no response. On January 6, 2017, the trial court held a hearing on Bauman's motion to enforce. The trial court considered briefs and affidavits submitted by the parties, with Elrod arguing that the parties had reached only an unenforceable agreement to agree. On February 28, 2017, the trial court granted summary judgment to Bauman and ordered Elrod to execute the Agreement and Release. *See id.* Elrod appealed.[1]

---

[1] Bauman, Davis, Madison Avenue Athletic Club, M.A.A.C., and SEND each received notice of the appeal, but only Elrod and Bauman were active parties on appeal.

By the time the *Elrod* opinion was handed down, the gym had been sold. On July 12, 2017, the closing for the sale took place. Chicago Title Company, LLC, Madison Avenue Athletic Club, Inc. (as the seller), Elrod, and Bauman executed an agreement to escrow the net sale funds of $811,742.83. The gym buyer granted M.A.A.C. and Elrod each a written easement to use an alley at 328 Prospect Street.

On appeal, this Court considered whether the Mediated Settlement Agreement was an enforceable contract and whether the trial court had properly ordered Elrod to execute the Agreement and Release. We concluded:

> [T]he trial court erred to the extent that it ordered Elrod to comply with the terms of the Agreement and Release, as that document was not agreed to by the parties. However, Elrod is bound by the terms of the Mediated Settlement Agreement, which was the result of an hours-long mediation at which he was represented by counsel and which was signed by both parties. Accordingly, we reverse the order of the trial court enforcing the terms of the Agreement and Release and remand with instructions that the trial court enforce the terms of the Mediated Settlement Agreement.

*Id.* at 7.

Bauman filed a motion to appoint a commissioner to enforce the Mediated Settlement Agreement. On May 23, 2018, Elrod filed a motion for interpretation and determination of rights, asking for a four-hour evidentiary hearing to address reimbursement for financial contributions, the date of assumption of mortgage obligations, and what type of deed would be required to transfer the property at 1041 High Street. On July 2, 2018, the trial court set the matter for a one-hour hearing and instructed the parties to "submit evidence and legal arguments in writing on these issues by July 27, 2018." (Appellee's App. Vol. II, pg. 47.) The hearing order was subsequently amended to permit an exchange of proposed evidence between the parties and to schedule two

hours for the hearing. Bauman made submissions to the court; Elrod provided proposed submissions to Bauman's attorney; and Davis made no submission.

[7] At the hearing on August 3, 2018, attorneys for Davis, Bauman, and Elrod presented arguments. Elrod's attorney attempted to call a witness to testify to the value of Elrod's labor contributions, but the trial court disallowed testimony, clarifying that the proceeding before the bench was not a trial but a hearing on remand.

[8] On October 4, 2018, the trial court entered its order of enforcement, accompanied by sua sponte findings of fact and conclusions of law.[2] On November 5, 2018, Elrod and Davis filed motions to correct error. On November 21, 2018, the trial court entered an order amending the October 4, 2018 order to require that Bauman formally assume a mortgage obligation as to property at 6427 Canna Court. Elrod and Davis each initiated an appeal, and the appeals were subsequently consolidated for review.

# Discussion and Decision

## Standard of Review

[9] This Court instructed the trial court to enforce the terms of the Mediated Settlement Agreement. Settlement agreements are governed by the same

---

[2] The findings and conclusions were not requested in writing by a party pursuant to Indiana Trial Rule 52(A).

general principles of contract law as any other agreement. *Fackler v. Powell*, 891 N.E.2d 1091, 1095 (Ind. Ct. App. 2008), *trans. denied*. The interpretation and construction of a contract is a function for the courts. *Id.* at 1095-96. If the contract language is unambiguous and the intent of the parties is discernible from the written contract, the court is to give effect to the terms of the contract. *Id.* at 1096. A contract is ambiguous if a reasonable person would find the contract subject to more than one interpretation; however, the terms of a contract are not ambiguous merely because the parties disagree as to their interpretation. *Id.* When the contract terms are clear and unambiguous, the terms are conclusive and we do not construe the contract or look to extrinsic evidence, but will merely apply the contractual provisions. *Id.*

[10] Here, one settlement term contemplated future conduct of the parties and future expenditures to accomplish renovation of the gym. In enforcing the terms of the Mediated Settlement Agreement, the trial court was required to determine whether reimbursable expenditures had been made by a party. Thus, the trial court acted as a fact-finder. The court did not hear witness testimony but heard argument and examined documentary submissions. The trial court sua sponte entered findings of fact and conclusions thereon. Sua sponte findings and conclusions control only as to the issues they cover, and a general judgment standard applies to any issue upon which the court has not found. *Nelson v. Marchand*, 691 N.E.2d 1264, 1267 (Ind. Ct. App. 1998). In reviewing findings and conclusions, we first determine whether the evidence supports the findings and then whether findings support the judgment. *K.I. ex rel J.I. v. J.H.*, 903

N.E.2d 453, 457 (Ind. 2009). We will not set aside the judgment unless it is clearly erroneous. *Id.* A judgment is clearly erroneous when there is no evidence supporting the findings or the findings fail to support the judgment. *Id.* A judgment is also clearly erroneous when the trial court applies the wrong legal standard to properly found facts. *Id.*

## Summary Proceedings on Remand

At the hearing upon remand, Elrod's counsel requested the opportunity to present witness testimony. The trial court denied the request, on grounds that there was no need "to try a case settled two years ago" and the parties had been ordered to submit evidence in documentary form. (Tr. Vol. II, pg. 105.) On appeal, Elrod contends "the trial court's ruling that no witnesses were allowed by any party to be called deprived him of his constitutionally-protected right to due process under U.S. Const. Amend. XIV § 1 and IN. Const. Art 1 § 12." Appellant's Brief at 16. The "opportunity to be heard" is a fundamental requirement of due process under the Fourteenth Amendment to the United States Constitution. *Podgor v. Indiana University*, 381 N.E.2d 1274, 1281 (Ind. Ct. App. 1978). Also, Article 1, Section 12 of the Indiana Constitution provides for the right to be heard in court:

> All courts shall be open; and every person, for injury done to him in his person, property, or reputation, shall have remedy by due course of law. Justice shall be administered freely, and without purchase; completely, and without denial; speedily, and without delay.

[12]     In *Elrod*, this Court remanded the matter for enforcement of the Mediated Settlement Agreement. We did not order the trial court to conduct further evidentiary proceedings and thus, Elrod had no such entitlement. The trial court, having been advised that the parties disagreed as to how several provisions of their agreement should be enforced, ordered that the parties make written evidentiary submissions. The trial court subsequently amended its order to permit exchange of materials between the parties. Elrod did not comply with the order for written submissions to the court. Rather, after his written requests for an evidentiary hearing had been denied, he appeared on the day of hearing prepared to elicit testimony from an expert witness. Elrod was constrained to making an offer of proof regarding the value of his work. Even so, he did not raise any constitutional objection. He does not fully develop constitutional arguments on appeal.

[13]     Elrod was not deprived of his opportunity to be heard. He was afforded the opportunity to make written submissions to the trial court and present argument thereon. We acknowledge that, in light of factual determinations to be made, the better practice may have been to allow witness testimony. This concept will be more fully addressed as we discuss the issues on appeal; however, Elrod has not shown that the exclusion of witness testimony rises to the level of constitutional deprivation.

# Quitclaim

[14]     Elrod contends that the trial court erred in ordering Bauman to execute a quitclaim deed to Elrod transferring any interest Bauman might have in 1041

High Street. According to Elrod, because Davis is the sole legal owner of 1041 High Street, a quitclaim deed would transfer "no interest whatsoever" to Elrod and this is inconsistent with the intent of the Mediated Settlement Agreement. Elrod's Brief at 19, Davis's Brief at 15. Elrod argues that Bauman must *obtain* and transfer interest in 1041 High Street via a warranty deed, to avoid breach of the Mediated Settlement Agreement. *Id.* at 20 (emphasis added).

[15] Indisputably, both parties knew when they negotiated the Mediated Settlement Agreement that Davis, who is Elrod's sister, was the owner of record and the occupant of 1041 High Street. Elrod bargained for – and received – the right to have Bauman relinquish any claim to 1041 High Street. But Bauman and Elrod inserted no language in their agreement requiring, or even suggesting, that Bauman would be required to purchase 1041 High Street from Davis so that he could in turn execute a warranty deed for that property to Elrod. The value of the bargain to Elrod may consist of the intrinsic value derived from providing for his sister or it may be that he has an expectation of ultimately receiving a financial benefit. Regardless, the Mediated Settlement Agreement did not specify that Bauman would execute a warranty deed; a quitclaim deed – conveying Bauman's interest, if any – is sufficient to satisfy Bauman's obligation.

## Assumption of Mortgage Payments/Refinancing

[16] At the time of the execution of the Mediated Settlement Agreement, Bauman was liable for mortgage payments on certain properties that were to be allocated to Elrod. The parties agreed to the assumption of liabilities corresponding to

ownership but did not specify a particular date or method. The trial court found that the parties intended immediate assumption of mortgage payments, to be followed by formal refinancing.[3] Specifically, the order stated:

> 66. A plain language reading of the Agreement clearly indicates that the parties intended Mr. Elrod to assume the mortgages and indemnify Mr. Bauman effective from the date of the Agreement.

> 67. Mr. Elrod is required to assume the mortgage on 1045 High Street and indemnify Mr. Bauman thereon effective August 1, 2016.

> 68. Mr. Elrod is required to assume the mortgage on Clover Drive and indemnify Mr. Bauman thereon effective August 1, 2016.

(App. Vo. II, pg. 26).

[17] Elrod contends that the parties intended the assumption of liabilities to take place on the date of the real estate closing as to a respective property.

> [W]here no time for performance is specified in the contract the law will imply that it must be performed within a reasonable time. *Marion Trucking, Inc. v. Harwood Trucking, Inc.* (1954), 125 Ind. App. 1, 116 N.E.2d 636. Moreover, what constitutes a reasonable time within which an act is to be performed depends

---

[3] Recognizing that the mortgagees might not consider Elrod qualified to assume the mortgages, the trial court ordered that, if Elrod was unsuccessful in obtaining his own financing, the mortgages would be satisfied from the gym proceeds.

on the subject matter of the contract, the situation of the parties and the circumstances attending the performance.

*Jay Clutter Custom Digging v. English*, 393 N.E.2d 230, 232 (Ind. Ct. App. 1979).

[18] The Mediated Settlement Agreement distributed multiple properties, several of which were mortgaged. The trial court concluded that the parties intended an allocation of responsibility for debt contemporaneous with the allocation of ownership. An immediate assumption by Elrod of the obligation to pay for his own individual properties is reasonable where he had ownership rights to those properties and no further responsibility to manage Bauman's individual properties.

[19] Additionally, the trial court concluded that the parties intended that Elrod refinance the indebtedness for his own properties in his own name. Elrod argues that the language obligating Elrod to pay "that" mortgage held by Bauman means that the particular mortgage "would have to remain in force as agreed by Bauman and the lender." Appellant's Brief at 23. The complaint was filed to end the business venture and the business relationship between the parties. This was more efficiently accomplished if the parties held respective properties and respective debts and were not co-obligors on debt. The trial court did not err in concluding that the parties intended a formalization of the division as opposed to continuation of long term obligation by a non-owner with an expectation of indemnification by the other party.

# Reimbursements

During the thirty plus years of their joint venture, Bauman provided capital and Elrod provided sweat equity.  Profits were divided equally.  If there was a monthly loss, Elrod would meet with Bauman and report the aggregate amount of the shortfall, and Bauman would provide additional funding.  This course of conduct ended on June 13, 2016, when the parties executed the Mediated Settlement Agreement and defined their future course of conduct.  Paragraph 13, employing prospective language, decrees that Elrod *will* manage the gym and account for the income and expenses from its operation.  In the event that income does not exceed expenses and a party contributes to expenses described in Paragraph 13, he is to be given a corporate note.

> [Elrod] shall manage and operate the gym until it is sold and properly account for all income and expenses.  In the event either party contributes to such expenses, that party shall be given a note by Madison Avenue Athletic Club, Inc. for such loan plus interest at 4%.

(App. Vol. II, pg. 71.)  The plain language of Paragraph 13 contemplates a contribution that is (1) in the future (2) before sale of the gym and (3) for which a proper accounting has been made.

At the time the agreement was executed, there may have been ongoing work to remediate public health violations at the gym.  On August 22, 2014, four months after Bauman filed his complaint, the Indiana Board of Health filed a complaint against the Madison Avenue Athletic Club, as the owner of the

gym.[4]  The potential penalty for continued violation was $2,500 per day.  The parties agreed that remediation was necessary to effectuate a sale and cure the violation.  The Board of Health conducted an inspection of the gym on August 29, 2016 and, on September 23, 2016, the Board of Health complaint was dismissed.  On December 29, 2016, Elrod filed a mechanic's lien against the gym property, in the amount of $83,302.00.[5]

[23]  At the remand hearing, Elrod argued that he was entitled to payment for his services and reimbursement of expenses related to two primary events, the remediation of health code violations at the gym and the move out upon the sale of the gym.  Elrod also sought reimbursement for leasing a property after the sale of the gym (where he had reportedly stored gym property not taken by the gym buyer).  Finally, he requested payment for time spent negotiating for parking access and sale of a liquor license.

[24]  Elrod submitted photographs to show before and after conditions at the gym.  He claimed he was due:  $112,195.85 for work, labor, and materials to complete Board-of-Health complaint renovations, $31,005.27 for cash advances for gym operating shortfalls, and $62,000.37 for cleaning, storage, and interest.  He provided a copy of a contractor agreement between ALE and Madison Avenue

---

[4] Allegedly, there had been deterioration of exterior trim, eaves, and window frames; there were exposed surfaces with lead-based paint; exterior masonry was loose; an exterior stairway had a loose or missing handrail; exterior steps were unsafe; gutters were missing; the roof needed repair; panes of glass were missing or broken; and some exterior bricks were loose.

[5] Elrod executed a limited release of the lien to permit the sale of the gym to close, agreeing that the issue of reimbursement would be determined before distribution of the escrowed sales proceeds.

Athletic Club, reciting that ALE would be paid $75.00 per hour for removal of debris. Elrod had signed the agreement as the President of Madison Avenue Athletic Club, and his wife, Jan Elrod, had signed as the secretary of ALE.[6] Elrod also submitted bills from ALE, albeit lacking descriptions of work performed. For example, a "total bill for work completed at Madison Avenue Athletic Club from 5/13/2016 – 8/30/16" aggregating to $84,072.00, contained only summaries of amounts, such as a "5/13/16 bill of $6,000.00."[7] Exhibit L.

[25] The trial court found that Bauman contributed $30,000.00 to "making repairs to bring the Gym into compliance as ordered by the Board of Health" and that Elrod had not properly accounted for the use of those funds. Appealed Order at 10. As for Elrod's claims for reimbursement, the trial court disallowed the claimed expenses as unsubstantiated, unnecessary, or conflict of interest transactions that were a breach of Elrod's fiduciary duty. Ultimately, the trial court concluded that Elrod had breached his fiduciary duty under Indiana Code Section 23-1-35-2.

[26] That statute defines a "conflict of interest transaction" and provides in relevant part:

---

[6] Elrod is the President and owner of ALE.

[7] There is a handwritten notation that this $6,000 charge was paid in full by check #4847 on July 13, 2016. Elrod claimed to have paid this from his personal funds, as a loan to the corporation.

A conflict of interest transaction is a transaction with the corporation in which a director of the corporation has a direct or indirect interest. A conflict of interest transaction is not voidable by the corporation solely because of the director's interest in the transaction if any one (1) of the following is true:

(1) The material facts of the transaction and the director's interest were disclosed or known to the board of directors or a committee of the board of directors and the board of directors or committee authorized, approved, or ratified the transaction.

(2) The material facts of the transaction and the director's interest were disclosed or known to the shareholders entitled to vote and they authorized, approved, or ratified the transaction.

(3) The transaction was fair to the corporation.

[27] The trial court considered whether transactions were conflict-of-interest transactions but did not address whether any were ultimately fair to the corporation. Elrod contends that each of the transactions for which he claimed reimbursement was a transaction "fair to the corporation." *See id.* He also contends that the remediation of health and safety violations had not been completed when the Mediated Settlement Agreement was executed. The record before us, consisting of documents and the transcript of argument of counsel, does not permit meaningful appellate review of these contentions. Although the trial court had not been specifically ordered on remand to conduct an evidentiary hearing at which witness testimony would be heard, the better practice would have been to do so.

[28]   The Mediated Settlement Agreement did not entitle Elrod to payment for his subsequent sweat equity or management services. Bauman had in the past infused capital into the venture and continued to do so. Elrod was to continue to manage the gym with an expectation of a share of the profits upon sale. Nonetheless, Bauman and Elrod agree that remediation work was necessary and it in fact occurred; the record indicates that the Board of Health complaint was dismissed approximately three months after the Mediated Settlement Agreement was executed. But it is unclear what remediation expenses, if any, were post-agreement expenses not covered by Bauman's $30,000.00 contribution.

[29]   Beyond denying Elrod's claims for compensation for services, the trial court excluded the entirety of Elrod's claims for reimbursement. The trial court expressed concerns about inadequacy of billing, lack of documentation, unilateral decision-making and self-dealing, and our review of the woefully inadequate documents causes us to share the trial court's concerns. That said, however, we simply cannot ascertain, as a matter of law, that the trial court did not clearly err in its blanket denial. With further factual development, testimony, and determinations of credibility, the trial court is in a position to determine whether the expenses claimed by Elrod are each outside the parameters of Paragraph 13 and not "fair to the corporation." I.C. § 23-1-35-2. We are not in a position to do so. Nor can we make a factual determination that Elrod did, or did not, make a legitimate loan of $6,000.00 to Madison Avenue Athletic Club after the execution of the Mediated Settlement

Agreement.[8]  We therefore remand with instructions to the trial court to conduct an evidentiary hearing on this issue.[9]

## Claim to Lot 22/1030 High Street

[30]  Paragraphs 1 and 2 of the Mediated Settlement Agreement allocated the properties bordered by High Street.  Elrod was to receive lots 1033, 1034, 1035, 1037, 1039, 1041, 1045, 1047, 1049, and 1055.  Bauman was to receive lots 330, 332, 336, 340, 1042, 1046, 1047 and 1048.  These were properties that were "titled either in the name of [Bauman] and/or [Elrod] and MAAC, Properties, Inc." (Exhibit A, pg. 1.)  Bauman was to "receive all shares equaling 100% of MAAC Properties, Inc." *See id.*

[31]  After the Mediated Settlement Agreement was reached, Elrod requested that the Marion County Assessor designate certain property as a separate parcel for taxation.  On July 26, 2018, Elrod paid $133.06 in real estate taxes for property identified as "Nobles Sub L22" or 1030 High Street.  (Appellee's App. Vol. II, pg. 42.)  At the remand hearing, Elrod asserted that this parcel was his separate property, not distributed by the Mediated Settlement Agreement.

---

[8] The trial court observed that Elrod claimed to have loaned $23,183.75 to Madison Avenue Athletic Club, but submitted a sole supporting document, one check in the amount of $6,000.00.

[9] To the extent that Elrod suggests the trial court was required to conduct a hearing on the quantum meruit value of Elrod's services, we disagree.  The equitable theory of quantum meruit, or unjust enrichment, may be raised where a measurable benefit has been conferred upon a defendant under circumstances where retention of the benefit would be unjust.  *King v. Terry*, 805 N.E.2d 397, 400 (Ind. Ct. App. 2004).  Where, as here, there is a contract, the equitable remedy is inapplicable.  *See id.*

[32] Bauman argued that this property had been part of a larger parcel obtained at a sheriff's sale and the agreement had contemplated that Bauman receive the entirety of the sheriff's sale property. The trial court observed that Paragraph 2 of the Agreement granted Bauman property inclusive of lots 330, 332, 336, and 340 on Prospect Street. Having examined the documentary evidence, the trial court entered findings in pertinent part as follows:

> 167. The Sheriff's Deed dated December 28, 2001 and recorded with the Marion County Recorder's Office as instrument number 2002-0093948 includes the entirety of Lot Numbered 22 in its legal description of the properties "more commonly known as 330, 332, 336, & 340 Prospect."

> 168. The quitclaim deed recorded with the Marion County Recorder's Office as instrument number A201700086957 purporting to transfer real estate known as Lot 22 or 1030 High Street to Mr. Elrod was not executed until July 19, 2017, <u>more than a year after the Agreement was signed</u>.

> 169. The quitclaim deed recorded with the Marion County Recorder's Office as instrument number A201700086955 purporting to transfer real estate known as 330 Prospect Street to Mr. Elrod was not executed until July 19, 2017, <u>more than a year after the Agreement was signed</u>.

> 170. A property allegedly located at 1050 High Street does not appear anywhere in legal records until the Marion County Assessor's Office was asked to split Parcel Number 1026014 (1046 High Street) on July 8, 2016 by the owner of the property. Mr. Elrod is the purported owner who asked the Assessor's Office to split the property without Mr. Bauman's knowledge or consent.

171. The current titleholder of 1046 High Street is Mr. Elrod, though Paragraph 2 of the Agreement grants 1046 High Street to Mr. Bauman.

172. Mr. Elrod never raised the contention that he was entitled to Lot 22 or the alleged properties at 1030 High Street or 1050 High Street at the time of the Agreement, trial or appellate court level .. [or] contended that any portion or interest in the Apartment Land or Four-plex Land were to be reserved to him and has waived those claims.

(Appealed Order at 19-20.) (Emphasis in original.)

[33] The trial court concluded that Elrod had agreed to transfer to Bauman "Apartment Land and Four-plex Land" and Elrod's post-agreement attempt to enlarge the property distributed to him was contrary to the parties' agreement and Elrod's claims were "denied." *Id.* at 21. At the same time, however, the trial court ordered Bauman to procure a survey to "clearly define the modernized legal descriptions of the Apartment Land and the Four-plex Land as well as the street addresses to which they relate." *Id.*

[34] A survey describing metes and bounds may be utilized to settle boundary disputes. *See, e.g., Lane Alan Schrader Trust v. Gilbert*, 974 N.E.2d 516, 517 (Ind. Ct. App. 2012). Here, there is no boundary dispute; rather, there are competing claims of ownership of certain property. It appears that Elrod attempted to claim more property than the Mediated Settlement Agreement allowed but, absent additional factual development, we cannot determine as a matter of law

the parties' respective ownership rights.  We remand for an evidentiary hearing on this issue.

## Easement to Alley at Prospect Street

[35]     Elrod owned a vacant alley on the east side of the gym.  Regarding this alley, Paragraph 3 of the Mediated Settlement Agreement provides:

> The vacated alley that is due west of lot 330 shall remain in [Elrod]'s name unless it is purchased by the purchaser of the gym in which case [Elrod] will transfer his interest at no additional cost to Madison Avenue Athletic Club, Inc.  If the gym purchaser does not purchase the vacated alley, upon closing of that sale, [Elrod] will deed the vacated alley to [Bauman] so long as [Bauman] remains the owner of the parcels 336 and 340 Prospect set over to him in paragraph 2 above.

(Exhibit A at 1-2.)  To effectuate the sale of the gym, Elrod deeded the alley to the gym purchaser.  In turn, the gym purchaser granted M.A.A.C. and Elrod a written easement to use the alley.  According to Bauman, Elrod was likely granted an easement because he was at the time exercising management duties on behalf of M.A.A.C.

[36]     The trial court concluded that the Mediated Settlement Agreement reserved to Elrod no interest in the alley and ordered that Elrod execute a deed transferring his interest in the easement to Bauman or M.A.A.C., as owner of the dominant land.  Elrod argues that he should not have been required to relinquish an easement granted to him by the purchasers of the gym.

[37] Paragraph 3 sets forth alternatives, but neither scenario contemplates that Elrod would have an interest in the alley after consummation of the gym sale. Either the gym purchaser could purchase the vacated alley or, if the gym purchase did not include the alley, Elrod would execute a deed so that ownership of the alley would correspond to ownership of certain parcels retained by Bauman. A third scenario actually transpired – the gym buyer purchased the alley and granted Elrod an easement. The gym buyer was not a party to the Mediated Settlement Agreement and could grant an interest not contemplated therein. The trial court's order that Elrod relinquish a property interest granted to him by a third party is not an order in enforcement of the Mediated Settlement Agreement.

## Purported Dismissal of SEND Claim

[38] Finally, Elrod argues that the trial court erred by purportedly dismissing with prejudice any claim with respect to SEND. In 2008, SEND and M.A.A.C. executed two leases with options to purchase related to portions of Prospect Street. Contingent upon M.A.A.C. making improvements to a parking lot, Madison Avenue Athletic Club would have the right to use the parking spaces. The specified time passed without improvements being made and, by the time of the remand hearing, there was no active agreement between SEND and Bauman, Elrod, Madison Avenue Athletic Club, or M.A.A.C. Despite the failure of the contingency, Elrod may have engaged in negotiations or provided other management services with respect to parking availability.

[39] The trial court made the following entry denominated as finding of fact 142:

> The court dismisses with prejudice any claims that either party might raise regarding the SEND property. The issues with them are moot and the parties no longer have a colorable claim to the SEND property or lease options.

(Appealed Order at 16.) The trial court need only have enforced the Mediated Settlement Agreement on remand. Regardless of whether Elrod negotiated with SEND representatives or expended other efforts to obtain parking near the gym, the Mediated Settlement Agreement does not provide for payment for his management services.[10] The trial court could provide the parties with no relief on a SEND related claim. The order purportedly dismissing a moot claim is superfluous.

## Order to Davis to Execute Deed

Davis was named as a defendant to answer as to any interest she might have in 1041 High Street. Bauman asserted, and Elrod has not disputed, that $16,500.00 of venture funds were provided to Davis to purchase that property at a tax sale in 2013. Apparently, Davis resided in and had improved the property, and no deed had ever issued to Bauman, Elrod, or either of the companies in which they were shareholders. However, 1041 High Street was a property included within the Mediated Settlement Agreement, thereby excluding a future equitable claim by either party to the agreement.

---

[10] As the trial court observed, Elrod was paid for his services via his receipt of a share in the profits. Bauman had provided capital for his 50% share and Elrod had provided services for his 50% share. At times, despite the contributions of the parties, there had been shared losses.

On remand, the trial court was tasked with enforcing the Mediated Settlement Agreement, to which Davis is not a party. Elrod was given that which he bargained for – Bauman will make no claim that he holds an equitable interest in 1041 High Street or that he is entitled to reimbursement of any portion of venture funds expended to acquire that property. Elrod's subjective expectation that his sister would later relinquish a claim to that property, or Davis's expectation that she would retain the property free and clear, is irrelevant to enforcement of the Mediated Settlement Agreement. Davis simply is not bound by an agreement to which she was not a party. The trial court's order to Davis that she execute a quitclaim deed to Elrod goes beyond enforcement of the Mediated Settlement Agreement and is thus clearly erroneous.

# Conclusion

Elrod has not established that he was denied due process under the United States Constitution or the Indiana Constitution. We affirm the order that Bauman execute a quitclaim deed for 1041 High Street and the order regarding mortgage assumption. We reverse the orders that are not enforcing the Mediated Settlement Agreement, specifically, the order that Davis execute a quitclaim deed to 1041 High Street, the order that Elrod execute a quitclaim deed to an easement pertaining to an alley, and an order purportedly dismissing a potential SEND claim. We remand for an evidentiary hearing upon the remaining issues.

Affirmed in part, reversed in part, and remanded for an evidentiary hearing.

Najam, J., and May, J., concur.